### DECKER v. SANFORD.

(Circuit Court, N. D. New York. February 8, 1905.)

#### No. 3,460.

PATENTS—INVENTION—BASEBOARDS AND WAINSCOTING.

 The Decker patent, No. 346,899, for baseboard and wainscoting construction, consisting essentially in fastening the carpet strip or bottom molding to the floor, and not to the baseboard, and using, if desired, a top molding extending below and in front of the top of the baseboard, and fastened to the wall only, and not to the baseboard—the purpose being to cover by such moldings the spaces caused by the shrinking of the baseboard and the floor—is void for lack of patentable invention, and also for anticipation in the prior art.

Action at Law for Damages for Alleged Infringement of Letters Patent No. 346,899, dated August 10, 1886, granted to George F. Decker, for baseboard and wainscoting. Jury was duly waived.

Ward & Cameron, for plaintiff.
Osgood & Davis, for defendant.

RAY, District Judge. The patent in suit, for baseboard and wainscoting, No. 346,899, relates to the art of house carpentry. Same was applied for October 20, 1883—no model—and, after rejection and amendment was, as amended, finally allowed, and letters patent issued August 10, 1886, to the plaintiff, George F. Decker. The patentee, Decker, in the specifications, states the objects of his alleged invention to be as follows:

"My invention relates to improvements in the manner of making and putiting up of baseboards and wainscoting, and the manner of joining the ends of baseboards together; and the objects of my improvements are, first, to prevent apertures or spaces being formed between the baseboard and wainscoting and the floor, or between the baseboards and the plastering; second, to prevent wind entering into the room through said spaces; and, third, to prevent the warping and shrinking of said baseboards. I attain these objects in the manner illustrated in the accompanying drawing, in which"—

Then follows a description of his drawings, and he then continues:

"A is a molding of any form placed on the floor; B, the center board; C, the molding on the top of the center board; D, a wedge of any material. I do not restrict my invention, in its use, to any material. In carrying out my invention, I securely fasten a molding, A, to the floor; then place in the groove formed in the upper face of such molding, or at the back of said molding, extending to the floor, and between the molding and the wall or studding, a center piece, B, of any material, without fastening the said center piece to either the top or bottom molding, or to the wall or floor. I then, if it is desired, place above and partly in front of said center piece the upper molding, C, and securely fasten said upper molding, C, to the wall or studding. The center pieces may be in one strip, as in a baseboard, or in several perpencircular strips, as in wainscoting. Where a bottom molding only is used, I securely fasten the upper edge of said center board to the wall. The center board being entirely loose where two moldings are used, or at its lower edge where only one molding is used, it does not affect either the upper or lower moldings, and, being of sufficient width, cannot admit of the formation of a space either above the lower molding or below the upper molding, if the latter is used, or between the wall and the center board, where an upper molding is not used. Where in long lengths of baseboard it is necessary to make a joint, I cut a groove in the two ends of the center boards at such joint, and insert in the cavity thus formed at the union of the two ends of the said center board a wedge of any material, in order to prevent a warping of the wood forming such center board.

Having thus described my said invention, what I claim, and desire to secure by letters patent, is:

"(1) In a baseboard or wainscoting, the combination, with a center piece secured to the wall, with freedom to shrink, of a molding secured to the floor, and presenting an upward projection to overlap the lower edge of said center piece, as and for the purposes set forth.

"(2) In a baseboard or wainscoting, the combination, with a center piece secured to the wall, with freedom to shrink, of moldings, one secured to the floor and presenting an upward projection, and the other secured to the wall and presenting a downward projection, said projections overlapping the edges of the center pieces, as and for the purpose described."

It will be noted that Decker states the object of his improvements to be "to prevent apertures or spaces being formed between the baseboard and wainscoting and the floor, or between the baseboards and the plastering; second, to prevent wind entering into

135 F.—8

the room through said spaces; and, third, to prevent the warping and shrinking of said baseboards."

In house construction of wood, we have sills around the outside of the whole house, with certain cross-sills which may or may not coincide with the partition walls; then floor joists supported by the sills, and on which the floors are laid; then upright studs forming the supports for the partitions and the sides of the main building. On the outside are nailed clapboards, with or without a paper lining, and board sheathing, and on the inside lath is nailed to the studding. The plaster is laid upon the lath. When wainscoting is used, it usually consists of narrow strips of wood placed upright and tongued together, extending from the floor upwards from three to four feet, except at windows, and about the entire rooms, except at door spaces. The wainscoting may extend only from the top or near the top of the baseboard upward. This wainscoting may be next the studding, or it may be placed after the sides are lathed and plastered down to the floor, or only to the top of the baseboard. The baseboard is a board placed lengthwise around the room, next the floor, and is usually from 6 to 10 inches in width. It is also called base and mop board.

It is well known that all green timber will shrink when severed from the stump; that all dry timber will absorb moisture, when exposed to it, and swell, and shrink again when exposed to heat. The shrinkage of timber contracts its width and thickness much more than its length. However thoroughly seasoned they may be, timbers and boards are found to shrink some in course of time after being put into a building. The result is that by reason of the greater shrinkage of sills and floor timbers and floor boards, which are laid horizontally, than that of the studding and wainscoting, standing upright, the baseboard, if fastened to the studding or lath, will be held in position, while the floor will be drawn down or away from it, or, more properly, the floor will shrink away from it. This result is, to some extent, also due to the shrinkage of the baseboard itself. No amount of fastening or nailing will prevent this shrinkage and the consequent formation of apertures or spaces between baseboard and floor or wainscoting and floor, or between baseboard and plastering, or wainscoting and plastering in some cases. It is also evident that the means employed by the patentee, as described and specified in the patent, will not prevent or tend to prevent the formation of these apertures or spaces. What the patentee in fact has attempted to do, and does, is to provide a means for hiding and concealing these apertures, and of obstructing the ingress of air or light through them. The patent calls for a molding extending lengthwise and parallel with the baseboard, fastened to the floor (not to the baseboard or wainscoting). Hence such molding will follow the floor. It is independent, in its action, of the baseboard and side walls. When the shrinkage before described occurs, if the molding is wider (that is, higher) than the space caused by the shrinkage, the molding will stand on the floor next the space so formed, and in front of it, and hide it, but will neither close nor occupy such space, nor prevent its forma-

tion. It will also form an obstruction to any current of air coming from the outside, but will not absolutely stop it. The same is true whether the baseboard or wainscoting, as the case may be, goes to the floor behind this molding, as in figure 2 of the drawings, or only into a groove in such molding on the top back thereof, as in figure 4 of such drawings. In either case all we have is the placing of a molding or strip of wood laid along in the angle formed by the floor and baseboard or wainscoting, either to conceal, or obstruct ingress and egress by air or vermin into or through, an aperture that is quite certain to be formed by the shrinkage of the adjacent timbers. So far as the first declared object of the patent is concerned, it is inoperative and worthless. As to the second, it is a partial preventive, as the shrinkage of the molding and baseboard away from each other will not leave the aperture wholly unobstructed. The construction pointed out, and means employed, will in no sense "prevent the warping and shrinking of said baseboards." No human power, except the maintenance of a uniform degree of moisture in the timber, will prevent timbers or boards from shrinking. The means employed might prevent the warping of the baseboard if the molding described is used both at the lower and the upper edges of the baseboard, for they would act to keep it in one position in spite of the nonuniform action of heat on the timber when impregnated with sap or moisture.

It is evident that the means of preventing warping to which the specifications refer is the insertion of a wedge in two grooves—one in the end of each baseboard where the two come together. No infringement of the patent in this respect is alleged or claimed. Nor can I see invention in such a device. I can well remember baseboards fastened together at the ends by holes bored in lengthwise of the boards, and plugs inserted, over 40 years ago. Such expedients as are pointed out in the patent in question for preventing warping would naturally and readily occur to any wellinformed mechanic, or to the farmer experienced in building board fences.

The claims relate to the construction of (1) a baseboard; and (2) a wainscoting. In this construction of a baseboard we have, in claim 1, the following combination of elements: (a) "a center piece secured to the wall, with freedom to shrink"; and (b) "a molding secured to the floor, and presenting an upward projection to overlap the lower edge of said center piece." The baseboard itself is the center piece referred to, and, as it comes next the floor, the other element is a molding—any molding—secured to the floor, and forming an upward projection adjacent to and in front of the baseboard. As the baseboard proper, or center piece, stands at right angles to the floor, this molding forming the upward projection is simply fitted into the angle, and will conceal the opening caused by the shrinking of the floor away from the board. The plaintiff, Decker, when on the stand, conceded and stated that baseboards scribed to the floor so as to form a tight joint were common in house construction long before he conceived his alleged invention. He also says that long before that the floor would shrink away from the baseboard, more or less, forming an aperture; that it was common

then to use an ogee molding in the angle formed by the floor and baseboard, to serve the same purpose as his invention—to hide and close such crack or aperture and shut out wind, etc. He says that this ogee molding was nailed to the baseboard, and not to the floor, for the rea· son that the ogee molding was not thick enough, in proportion to its height, to be held in position by nailing it to the floor. But while the drawing of the patent shows a quarter round, the claim is not confined to that, and covers any molding. Again, for such purposes an ogee molding is the well-known equivalent of the quarter round, and the ogee molding might have been nailed to the floor as securely as this molding or quarter round shown in the drawings, by making it thicker. Any square stick of suitable proportions for such a purpose would be the equivalent of the quarter round or ogee molding. The plaintiff substantially stated that his invention resided in the conception of a molding fastened to the floor so as to be drawn down with it, as it might shrink, leaving the baseboard proper freedom to shrink all by itself, in place of one fastened to the baseboard. In short, his invention is the conception that such a molding for such a purpose should be nailed to the floor, not the base. The plaintiff attempted to convey the impression that the quarter round was unknown prior to his invention, and that his invention brought it into use. He concedes, however, that by going a short distance from his home he found a mill with machinery that turned out the quarter round. Whether the molding used is rabbeted, or has a groove in the upper back edge, into which the baseboard proper may fit, the result is the same, as the principle is the same. Just what is meant by "secured to the wall, with freedom to shrink," is not apparent. The center piece is the baseboard or wainscoting, as the case may be; and, if it is ten feet long and eight inches wide, the only way to fasten it to the wall, and leave it perfect "freedom to shrink," is to use one screw or nail or bolt. If we use two, placed any distance apart, even if the same distance from the edge, the shrinkage will be somewhat interfered with. I can find no patentable invention in this intangible idea, "freedom to shrink." When, as described in the specifications, the baseboard or wainscoting, as the case may be, is held in place by the molding at the bottom, and another at the top—the one presenting an upward and the other a downward projection outside the lower and upper edges of the baseboard, or ends of the wainscoting, respectively— the baseboard or wainscoting has perfect freedom to shrink; that is, acted on by heat, the fibers close upon each other, and no nail, spike, bolt, or screw interferes. In such case the baseboard would, of its own weight, follow the floor in its shrinkage. In such case the only office or function of the lower molding would be to keep the baseboard in place; that is, back against the wall. When both an upper· and lower molding are used, the baseboard or wainscoting is not necessarily fastened to the wall by nailing or by screws; but, when only the lower molding is used, the upper edge of the baseboard or wainscoting must be securely fastened to the wall. So say the specifications. In both claims, however, the center piece is secured to the wall. This is done by spikes or nails or screws, or their equivalent. Hence we have no such thing in the claims as a center piece held by the moldings.

The whole alleged invention is the holding of a baseboard or

wainscoting in place by strips of wood fastened to the floor in front of and next to the lower edge or ends of the baseboard or wainscoting, the other edge or ends being fastened to the wall; also a provision for adding, if desired, a molding at the upper edge of the baseboard or wainscoting, where they meet the plaster. If the plastering only comes to the upper edge of the baseboard or wainscoting before the shrinking, the molding, being fastened to the wall, independent of the center piece, will cover the space formed by the shrinkage. Claim 2 only differs from claim 1 in having the upper molding, to which attention has been called. These ideas are not only old in theory and practice, but the construction is old, long antedates the patent, and is so simple that it would occur to any carpenter and joiner possessing ordinary skill in the art. Take, for instance, the construction at the base; a piece of wood an inch square nailed to the floor in the angle formed by floor and baseboard accomplishes the purpose of the patent. A molding substituted presents a better appearance, but is not more useful. Or a strip of wood 2 inches wide and 1 inch thick, running under the baseboard, with another strip nailed on the front edge thereof in front of the baseboard, makes the shoe, when a shoe is desired, and accomplishes the purpose of the patent. At the upper edge of the baseboard or wainscoting a strip of any width, and one-eighth or one-sixteenth of an inch thicker than such center piece, nailed to the wall next such upper edge, with another strip of any thickness, but of sufficient width to extend down some distance in front of such upper edge of the baseboard or wainscoting, forms the molding spoken of in the patent, or its equivalent, and performs all its functions. Such construction was old and in common use over 40 years ago, but, in any event, is so simple and obvious that this court cannot find invention in plaintiff's device, or sustain his patent.

It is proven beyond reasonable doubt that substantially the same form of construction pointed out in the plaintiff's patent was in common use in the vicinity of plaintiff's residence in the construction of buildings, long before he filed his application for a patent. Woodward's National Architect, copyrighted in 1869, shows and describes substantially the same construction. See Miscellaneous "Details, Bases, &c.," plate No. 94. In specifications, design No. 1, "Inside Finish," providing for baseboards, it is prescribed, "All the base to tongue down three-eighths inch into a molded carpet strip, rebated to receive it." "Rebated" means the same as "rabbeted." This construction is shown in plate 94, and plaintiff's figure 4 is almost identical with it. So in plate 94 we have almost an exact reproduction of the upper part of figure 2 in the Decker patent, showing the same molding, and same· connection or use with a center piece or baseboard or wainscoting. Again, in carpenters' specifications of design No. 10, "Inside Finish," we find (after providing for baseboards), "Insert the foot of the base into ogee molded carpet strips rebated one-half inch to receive it." In the carpentry art the carpet molding is the molding at angle of baseboard and floor.

In view of the prior art, as shown in prior patents in evidence, and prior publications relating to the art, it is found that there is no invention disclosed in plaintiff's patent. I also find that plaintiff's construction shown in his patent had been in public use some years before the date of his alleged invention, and long before the filing of his claim for a patent. In the Toussaint patent, relating to the construction of doors, No. 140,799, dated July 15, 1873, we find in the construction of doors, which is a part of the art of carpentry, rabbeted grooves in moldings to let in the adjacent parts and prevent the formation of openings, and also to prevent warping and shrinking. The drawings show the same construction in relation to a door that plaintiff's patent shows in relation to a baseboard and wainscoting. In the Fickett patent, No. 187,528, dated February 20, 1877, relating to the construction of frame houses, we find in the drawings, figure 1, precisely the same construction of a baseboard described and shown in the drawings of the plaintiff's patent. We have in the Fickett patent the rabbeted shoe for the bottom of the baseboard, and also a molding on top, which molding however, does not project over upon the face of the baseboard. In the Curtiss patent, No. 274,284, dated March 20, 1883, application filed January 19, 1883, relating to strips for repelling and destroying vermin, we find carpet moldings shown in the drawings and described in the specifications which are the same in principle and the same in construction as the plaintiff's. These carpet strips, which are the moldings in the angle formed by the floor and baseboard, are shown in figures 4, 5, and 6 substantially as a quarter round. Figure 7 has a rabbeted molding extending under the baseboard, and upward on the face thereof. Figure 10 has a quarter round in front of the lower part of the baseboard next the floor, then extending under the baseboard, and upward into a groove of the same, or behind the baseboard. In the Curtiss patent the specifications speak of figures 4, 5, 6, 7, 8, and 10 as representing various forms and arrangements of carpet or base moldings in cross-section. Further on in the specifications the patentee says:

"Referring to Figs. 4, 5, 6, 7, and 10, showing carpet moldings, I would remark that it is preferable that the moldings shown in these figures be nailed down to the floor, close up to the base, so that, as the floor beams shrink and take the floor with them, the vermin-proof molding will still close the aperture that may be made or increased between the floor and base, and still keep back and destroy any vermin that may attempt to pass through or between them. In Fig. 4 the molding has a groove, c, in the back, into which the vermin-proof felt or material, b, is folded and held fast. In Fig. 5 the felt is held in a similar groove by a wedging-strip, d. The backs of these moldings may be rabbeted, as shown, so as to let in the edge of the felt and allow the lip or top edge of the wooden molding to impinge directly on the face of the base or wall, as illustrated."

The whole construction of plaintiff's patent is shown in the Curtiss patent, and the very idea upon which the plaintiff's patent rests—the nailing of a molding to the floor instead of the baseboard—is specifically mentioned in the specifications of the Curtiss patent, as will be seen from the above quotation. It is well to mention that Curtiss did not patent the moldings, or the mode of putting

them together with baseboard and wainscoting. The patent relates to the insertion and addition of strips, covered with vermin-destroying material, to the moldings, baseboards, wainscoting,. etc.

The complaint of the plaintiff must be dismissed, with costs.